1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LINA S. SIAM,                                    No. C 04-0129 MHP

                    Plaintiff,

          v.                                     **MEMORANDUM AND ORDER**
                                                 **Re: Cross-Motions for Summary Judgment**

JOHN E. POTTER, POSTMASTER GENERAL

                    Defendant.
_____/

          Plaintiff Lina Siam brings this action against John E. Potter, in his official capacity as Postmaster

General of the United States Postal Service ("USPS").  Plaintiff alleges that she faced discrimination, a

hostile work environment, and retaliation based on her race and national origin, as well as her sex, in

violation of Title VII of the 1964 Civil Rights Act of 1964, 42 U.S.C. section 2000e et seq.  In addition,

plaintiff alleges violations of overtime protections under the Fair Labor Standards Act, 29 U.S.C. section

201 et seq.  Now before the court are the parties' cross-motions for summary judgment on this court's

subject matter jurisdiction and defendant's liability.  Having considered the parties' arguments and

submissions, and for the reasons set forth below, the court rules as follows.


BACKGROUND[1]

          Lina Siam has worked for the USPS since 1977, rising in her early years from the position of a

letter sorting machine operator to an Equal Employment Opportunity ("EEO") counselor/investigator.  Pl.'s

Dep. at 18:18, 20:3-5.  In addition to several promotions, plaintiff earned a number of awards for her

work, including a 1982 merit-based pay increase award, bonuses in 1995 and 1988, and certificates of

achievement in 1986, 1990, and 1992.  Dryovage Dec., Exh. A at 000096, 000118, 000136, 000142;

Simmons Dec., Exh. 1, Faison Aff. at 0001149.  From 1988 through 1992, plaintiff was given a "detail"

(an advantageous short-term assignment) to the position of Manager of EEO Processing.  Siam Dep. at

21:13-16.  In February 1993, plaintiff was promoted to the position of Senior EEO Complaints Processing

Specialist at the EEO Center in San Francisco, California.  Id. at 21:25-22:1.  That same year, plaintiff

received a very strong evaluation for her work.  Siam Dep. at 59:19-60:1.  Several of the staff she

supervised testified that she was a strong manager, and one of the EEO Managers who worked extensively

with Siam described her as a hard working "team player" who assisted other employees when necessary,

completed assignments in "an outstanding and professional manner," and took work home to clear case

back logs.  See Dryovage Dec., Exh. G, Yee Aff. at 1-2.  See also Dryovage Dec., Exh. A, Dumaguit

Dec. at 1; Dryovage Dec., Exh. A, Cruz-Crowder Dec. at 3.  Yee also testified that Siam was "well

deserving" of an award for her detail to reorganize a district office in Denver.  See Dryovage Dec., Exh. G,

Yee Aff. at 6.

Plaintiff believes that a glass ceiling for Asian/Filipino females has blocked her advancement within

the USPS since 1993, when plaintiff received her highest promotion.  She alleges that intersectional

discrimination on the basis of her race and national origin, on the one hand, and her gender, on the other,

have denied her training opportunities, performance awards, desirable temporary assignments, opportunities

to compete for promotions, participation in a bonus pay program, and information about entitlement to

overtime backpay.  See generally Compl. ¶¶ 9-37.  Verbal attacks by a co-worker and a supervisor, as

well as negative remarks made about plaintiff, magnified her experience of disparate treatment and allegedly

created a hostile work environment.  Id. ¶¶ 38-44.  Following plaintiff's complaints about both of these

concerns to the EEO, she believes that retaliation fueled further adverse employment actions.

In addition to a system of competitive promotions, advancement at the EEO occurred through

short-term details to higher positions.  These could last for less than thirty days, in which case the worker

would not receive a pay adjustment, or for longer periods (as long as several years in some instances), in

which case the employee would receive a full salary adjustment to the higher grade's pay.  Siam Dep. at

68:20-25.  Detail assignments provided important means to improve one's candidacy for promotion, and

United States District Court

For the Northern District of California

1   indeed employees were sometimes permanently promoted to positions they held on details. Opportunities

2   for details were not formally published, and they were rarely announced verbally to staff. See Dryovage

3   Dec., Exh. A-1, Cruz-Crowder Dec. at 000618; Dryovage Dec., Exh. A-1, Nelson Dec. at 000623.

4   Employees could inform supervisors of their interest, but the EEO did not use a written application process

5   for the positions, nor did it announce which employees were selected for details. Siam Dep. at 70:21-23.

6   Supervisors who anticipated that they would be absent for any length of time simply selected their

7   replacement. See Dryovage Dec., Exh. A-1, Cruz-Crowder Dec. at 000618.

8       Plaintiff alleges that in approximately 1993, shortly after her promotion to senior EEO specialist

9   (graded as an "EAS-19" position), her upward trajectory at the USPS began to stall. In 1993, her first-line

10  supervisor, Tamu Tatum, issued Siam a performance evaluation of "outstanding." See Siam Dep. at 36:7-

11  14. However, Bernadine Faison, Tatum's superior, did not award plaintiff a bonus or a salary increase

12  normally commensurate with a performance evaluation of "outstanding." See id. 59:19-60:1. She believes

13  that this lack of recognition was due to animus by her colleague William Norris, because shortly following

14  Tatum's evaluation, Norris tossed a copy of the evaluation on Siam's desk and remarked, "they think you

15  walk on water." Siam Dep. at 39:13-22. Faison had written on a note attached to the copy that Faison

16  and Norris should "discuss" the evaluation, and Siam inferred on that basis that Norris influenced Faison to

17  believe the evaluation was undeserved. Id. During the ensuing period, plaintiff believes that she was

18  overlooked for details lasting longer than thirty days. See Dryovage Dec., Exh. A., Siam Aff. at 001081-

19  82. Plaintiff was formally recommended by her immediate supervisor for a "far exceed" merit in 1996 and

20  1997, but she believes that Norris and Faison blocked the award. Id. at 001080. She also believes that

21  Faison barred her from special recognition. Id. at 001081. Lastly, based on her own personal

22  observations as well as on a document she saw which listed the training hours given to employees, plaintiff

23  believes she was given the least number of training hours of any EAS-19 employee. Siam Dep. at 65:20-

24  66:25.

25      Plaintiff's frustration with her pay grade and failure to receive bonuses continued. In June 1997,

26  plaintiff was assigned on yet another detail to a higher level position, but it was too short in duration to

27  receive additional pay under Postal Service policy. Siam Dep. at 101:3-11. In approximately April of

28

United States District Court
For the Northern District of California

1    1999, a desirable, extended detail to an EAS-21 position became available (again without an open

2    application), but plaintiff was passed up in favor of Brian Hemenway, a white male who was graded below

3    plaintiff as an EAS-17 employee. Id. at 70:7-14.  In May 2000, when the Acting Manager position at

4    Siam's EEO Complaints Processing Center (also an EAS-21 position) opened up for an extended detail,

5    plaintiff was not selected for the opportunity.  Dryovage Dec., Exh. A, Dumaguit Aff. at 1583.  The detail

6    was filled by Gerald Dumaguit, a Filipino male employee at the San Francisco Center who testified that he

7    had fewer qualifications for the position than plaintiff.  Dryovage Dec., Dumaguit Dec. at 1.  At the time of

8    his promotion, Dumaguit informed the center's acting manager that he felt Siam was more qualified for the

9    position and he asked whether she might file a discrimination complaint for being passed up. Id.  The

10   manager replied that she could not do so, because both Dumaguit and Siam were Filipino. Id.   Later that

11   year, plaintiff's supervisor Mary Robinson told Siam that she would like to place her in an extended detail

12   to a desirable position in the office's appeals section, but plaintiff was again passed up for the opportunity in

13   favor of Hemenway.  Siam Dep. at 135:6-13.  In September of 2000, Siam was excluded from

14   competition for a promotion to an EAS-21 position. Id. at 125:10-13.  By 2001, plaintiff still held the

15   same position and grade she had acquired in 1993.

16        As plaintiff's ascent began to plateau in 1993, plaintiff's colleague Norris, a Caucasian male,

17   continued a steady advance towards higher positions.  This progress came in spite of his apparent alcohol

18   problem, as several employees, including Siam, testified that they regularly noticed the odor of alcohol on

19   Norris's breath at work.  See Dryovage Dec., Exh. A, Dumaguit Dec. at 3; Dryovage Dec., Exh. A, Cruz-

20   Crowder Dec., at 3; Dryovage Dec., Exh. A, Nelson Aff. at 001322.  Norris and Siam had begun their

21   service in the USPS in 1978 and 1977 respectively, and both moved into positions as EEO

22   counselor/investigators in 1987 and 1988, respectively.  Norris Dep. at 16:17-17:6.  Between 1988 and

23   1993, they occupied the same positions.  Siam Dep. at 40:5-7.  In 1993, Norris was given an extended

24   detail to an EAS-21 position, and then again detailed to the job for a full two years starting in 1997 or

25   1998.  Dryovage Dec., Exh. A, Siam Aff. at 001081.

26        After a third extended detail to the EAS-21 level, Norris was permanently promoted into that

27   position in approximately August of 2000.  Siam Dep. at 81:2-23; Norris Dep. at 17:8-14.  Plaintiff alleges

28

4

United States District Court

For the Northern District of California

that management "changed the rules" on an EAS-21 position in order to block her eligibility and set Norris up for a non-competitive promotion. Siam Dep. at 125:10-13. In 2000, an EEO restructuring led USPS to offer local employees an option to downgrade their employment rank if they wished to remain in the area headquarters rather than move into a district headquarters. Simmons Supp. Dec., Exh. 1, Robinson Aff. at 001598; Robinson Dep. at 26:1-2. Siam elected to move into the San Francisco district office rather than accept the demotion. Simmons Supp. Dec., Exh. 1, Robinson Aff. at 001598. Norris similarly chose to move into a district office, but one day after making his decision, he changed his mind and accepted the demotion to EAS-17 to stay in the area office. Id.; Norris Dep. at 17:6-7. One month later, eligibility to compete for promotions to EAS-21 and EAS-23 level positions were granted only to area employees, making Siam and other Asian employees ineligible to compete for the positions. Simmons Supp. Dec., Exh. 1, Robinson Aff. at 001598. Norris was subsequently appointed to the EAS-21 opening, for which only two employees could apply. See id.; Siam Dep. at 132:18-19. Plaintiff was later told that an EEO manager had instructed certain persons not to share information regarding upcoming job openings with non-area employees. Siam Dep. at 126:12-16. Plaintiff filed a second request for EEO counseling shortly following this event.

Brian Hemenway, also a Caucasian male, similarly advanced well beyond plaintiff, though he began at a lower rank than plaintiff and was ,many years more junior in seniority and experience. In 1999-2000, Hemenway was selected for his first extended detail over Siam. Siam Dep. at 70:7-14. Later in 2000, plaintiff was informed that she would be chosen for a specific detail in which she had expressed interest, but she later learned that Hemenway was awarded the post. Id. at 135:6-13. Several employees testified to his inappropriate workplace conduct. See Siam Dep. at 135:6-13; Dryovage Dec., Exh. A, Nelson Dec. at 3; Dryovage Dec., Exh. A, Cruz-Crowder Dec., at 3. One employee testified that Hemenway left the office "on numerous occasions" for up to four hours at a time to go skating. Dryovage Dec., Exh. A, Dumaguit Aff. at 001583.

Plaintiff alleges that in addition to being treated more favorably, Norris and Hemenway created a hostile work environment. At an undated time, Norris allegedly referred to plaintiff as "dragon lady," a remark which she perceived to be racially motivated. Siam Dep. at 50:19-20. Norris was also overheard

United States District Court
For the Northern District of California

saying that he "had no problem getting rid of Lina." Siam Dep. at 46:23-47:3; Dryovage Dec., Exh. G, Yee Aff. at 3. Two specific instances of verbal abuse occurred in 2000. At a staff meeting in 2000, Hemenway, at the time a counselor/investigator at the EEO, asked a question regarding sexual harassment, and in response to plaintiff's answer, he stood up and aggressively told Siam "You don't know what you're talking about. You don't even know what sexual harassment is." Siam Dep. at 161:22-162:3. The acting EEO manager at the time told Hemenway he was "out of control" and referred the incident to managers at the area office, but Hemenway was not disciplined. Id. at 162:24-165:15.

On a second occasion in 2000, during a focus group meeting to discuss employee grievances, plaintiff explained that the justification for a new sign in/sign out policy was the need to curb unannounced employee exits during the day. Siam Dep. at 179:1-3. In response, Norris stood up, pounded his fist on the table, and angrily shouted, "Why are you lying?" Id. at 173:1-2. See also Dryovage Dec., Exh. A, Wright Dec. at 001327. Plaintiff testified that Norris smelled of alcohol, and she feared that he might strike her. Id. at 173:7-12. The moderator of the meeting told Norris "we do not want personal attacks here," but plaintiff does not believe disciplinary action was taken. Siam Dep. at 173:12-15, 176:22-24. The record suggests that the tensions at this meeting related to plaintiff's efforts to address lax discipline at the EEO Center, including employee tardiness and long stretches of absenteeism during working hours. See generally Siam Dep. at 167-172. See also Dryovage Dec., Exh. A, Dumaguit Aff. at 1583-84; Siam Dep. 167:21-23.

In January, 2001, plaintiff left the USPS on stress-related medical leave, where she has remained ever since. Approximately one month after plaintiff departed on stress leave, she was informed that her photograph had been posted on a bulletin board in the entrance of her building which identified criminal fugitives "wanted" by law enforcement. Siam Dep. at 180:8-16; Siam Dec. at 3. The placement of the photograph was purportedly because due to her stress leave, plaintiff needed medical clearance before entering the building. See Simmons Dec., Exh. 4, Bedell Dec. at 001673.

Plaintiff also alleges that during her leave from USPS, she was excluded from participation in two advantageous programs and income opportunities on the basis of her sex, as well as her race and national origin. First of all, USPS instituted a "variable pay program" for fiscal year 2001 which provided a form of

United States District Court

For the Northern District of California

1   performance-based pay.  See Siam Dep. at 206:3-8; Siam Dec., Exh. C, Notice of Right to File at

2   001540; Palisoc Aff. at 001457.  Plaintiff had commenced her medical leave in January of 2001, the first

3   year of the program.  Plaintiff was not notified of the program and she was excluded from participation.

4   Siam Dep. at 206:23-25.  Secondly, USPS determined that several EEO positions had been misclassified

5   as exempt from overtime entitlement under the Fair Labor Standards Act.  Simmons Dec., Exh. 6, Martin

6   Aff. at 001442-44.  Employees determined to be eligible for overtime backpay were notified of their

7   eligibility, and Norris received between $6,000 to $7,000 in backpay for the same level work performed in

8   the same period.  Norris Dep. at 37:8-25.  Plaintiff was not informed of the entitlement or her eligibility.

9   Siam Dep. at 206:23-24.

10          Other employees also experienced ill treatment and harassment that they perceived to be motivated

11   by their race or national origin, and several witnesses testified to barriers to their advancement, as well as

12   double standards for workers depending on their race or ethnicity.  See Exh. A-1, Dumaguit Dec. at

13   000613-616; Exh. A-2, Cruz-Crowder Dec. at 000620.  In addition, witnesses testified that the office was

14   divided along racial lines.  See Dryovage Dec., Exh. A, Dumaguit Dec. at 000613; Exh. A, Cruz-Crowder

15   Dec. at 000620; Exh. A, Nelson Dec. at 000623.  Michael Yee, an EEO manager, testified that over time

16   "it became more apparent" that Faison, an African-American supervisor in charge of many details and

17   promotions, "has a problem with Asians," and that over the years he had to question her treatment of

18   several Asian staff members, including Siam.  Dryovage Dec., Exh. G, Yee Aff. at 5.  Plaintiff testified that

19   Filipino persons in the personnel department were routinely subjected to comments such as "[t]his place is

20   like Manila Town."  See Siam Dep. at 124:6-13.

21          Plaintiff's history of EEO filings is as follows.  On April 29, 1999, shortly after her denial of a higher

22   level detail, plaintiff filed her first request for counseling, a prerequisite to the formal complaint she filed on

23   September 4, 1999.[2]  An administrative law judge heard plaintiff's case on the issue in January of 2002,

24   and held that the hiring decision was not influenced by discrimination.  His findings were adopted as the final

25   agency decision on June 6, 2003 and upheld on appeal to the Equal Employment Opportunity Center

26   Office of Federal Operations on December 8, 2003.

27          Plaintiff filed a second request for EEO counseling on October 2, 2000, after the EEO restructuring

28   in which she was prevented from applying for open positions.[3]  She filed her formal complaint in this second

7

1  matter on February 10, 2001.  After plaintiff's departure on medical leave, and precipitated by her

2  discovery that her photograph had been posted in the lobby, plaintiff filed a third EEO request for

3  counseling on February 7, 2001, followed by a formal complaint on April 15, 2001.[4]  Lastly, after plaintiff

4  learned that she was not included in the variable pay program, she filed a fourth request for counseling on

5  December 7, 2001 and a formal complaint on February 20, 2002.[5]  Plaintiff received a right-to-sue letter

6  and a final decision on all of her complaints on December 8 and 9, 2003, one month prior to the filing of the

7  present civil complaint on January 9, 2004.

8        The parties have filed cross-motions for summary judgment on whether plaintiff timely exhausted

9  the administrative prerequisites to this suit.  In addition, plaintiff has moved for summary judgment on the

10  issue of her prima facie case of discrimination and whether she has mitigated her damages.  Defendant has

11  asked this court to strike plaintiff's motion for summary judgment as procedurally improper and has moved

12  for summary judgment on liability for all claims, including plaintiff's eligibility to be classified as non-exempt

13  for the purposes of the FLSA.  Neither party has filed a single evidentiary objection with the court.[6]

14

15  LEGAL STANDARD

16  I.    Summary Judgment

17        Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no

18  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

19  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  Anderson v.

20  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

21  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The moving party

22  for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and

23  affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477

24  U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the

25  moving party need only point out "that there is an absence of evidence to support the nonmoving party's

26  case."  Id.

27        Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings

28  and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for

1   trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.;

2   Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make

3   credibility determinations, and inferences to be drawn from the facts must be viewed in the light most

4   favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520

5   (1991); Anderson, 477 U.S. at 249.

6

7   DISCUSSION

8          The present motions raise three issues for consideration: whether plaintiff filed a proper motion for

9   summary judgment, whether plaintiff has exhausted her administrative remedies, whether defendant can be

10  liable under Title VII for discrimination and retaliation, and whether defendant has carried its burden to

11  show that plaintiff's exemption from overtime might violate the FLSA.

12

13  I.      Propriety of Plaintiff's Motion

14         Defendant asks that this court deny plaintiff's motion on the basis that it is procedurally improper,

15  because she has moved for summary judgment on subparts of her claims. Arguing that summary judgment

16  requires appealable judgments disposing of entire claims, defendant argues that plaintiff has impermissibly

17  requested that this court decide sub-issues. Indeed, the propriety of partial motions for summary judgment

18  on subparts of claims remains disputed, though a consensus towards recognition of such motions is

19  emerging. See 11-56 Moore's Federal Practice - Civil § 56.40 (2005); Advanced Semiconductors

20  Materials America, Inc. v. Applied Materials, 1995 WL 419747 *2-3 (N.D. Cal. 1995) (Whyte, J.). This

21  court made its views on the question clear in an earlier disposition, which defendant acknowledges and

22  groundlessly distinguishes. In Bushnell v. Vis. Corp., this court wrote: "[t]his court believes that a proper

23  interpretation of Rule 56(b) allows summary adjudication on individual parts of claims brought against a

24  party." 1996 WL 506914, *11 (N.D. Cal. 1996) (Patel, J.). This holding was based soundly on the plain

25  language of Federal Rule of Civil Procedure 56. As applied to the present action, that language states that

26  a plaintiff may "move with or without supporting affidavits for a summary judgment in the party's favor upon

27  *all or any part* thereof." Fed. R. Civ. Pro. 56(a). In addition, based on the plain language of Rule 56(d),

28  it is now well-established that where a court denies judgment on a claim, it may nevertheless "grant" partial

United States District Court

For the Northern District of California

9

**United States District Court**
For the Northern District of California

1   summary "judgment" that establishes the existence or nonexistence of certain facts, even though no actual

2   judgment is entered on a claim.  See 11-56 Moore's Federal Practice - Civil § 56.40 (2005).

3          Plaintiff has moved for summary judgment on whether she has exhausted her remedies, established

4   a prima facie case of discrimination, and mitigated her damages.  As an issue of subject matter jurisdiction,

5   plaintiff's exhaustion of administrative remedies is clearly an appealable issue, and defendant has moved for

6   summary judgment on this same issue.  In regards to plaintiff's prima facie case, the Ninth Circuit recently

7   considered, on the merits, a lower court's denial of a plaintiff's partial motion for summary judgment

8   regarding his showing of a prima facie case.  See Enlow v. Salem-Keizer Yellow Cab Co., 389 F.3d 802,

9   804-05 (9th Cir. 2004).  The circuit has implicitly deemed the motion procedurally acceptable.  Similarly,

10  on the merits and without reference to impropriety, the circuit has considered a defendant's motion for

11  partial summary judgment on the issue of mitigation of damages.  See E.E.O.C. v. Farmer Bros., 31 F.3d

12  891, 906 (9th Cir. 1994).

13         On the basis of the plain language of rule 56(a), prior rulings of this court, and the Ninth Circuit's

14  implicit recognition of such motions, plaintiff's motion is held to be procedurally proper.

15

16

17

18  II.    Exhaustion of Administrative Remedies

19         To preserve the right to maintain a suit alleging employment discrimination against an agency of the

20  United States, a claimant must exhaust her administrative remedies by filing a claim of discrimination with

21  the allegedly offending agency in accordance with published procedures.  Leorna v. U.S. Dep't of State,

22  105 F.3d 548, 550 (9th Cir. 1997).  See also 29 C.F.R. §§ 1614 et seq. (setting forth Federal Sector

23  Equal Employment Opportunity Regulations).  Federal regulations require an aggrieved person to consult a

24  counselor prior to submitting a formal complaint.  29 C.F.R. § 1614.105(a).  Such contact must be made

25  within forty-five days of the allegedly discriminatory actions unless the complainant is entitled to an equitable

26  extension.  Id. § 1614.105(a)(1).  See Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982) (holding

27  that the principles of waiver, equitable tolling, and estoppel apply to timely administrative filing

28  requirements).

1    The scope of this court's jurisdiction over Title VII claims depends upon the scope of a plaintiff's

2    discrimination charge with the EEO department of their federal agency employer or the Equal Employment

3    Opportunity Center ("EEOC").  EEOC v. Farmer Bros. Co., 31 F.3d 891, 897 (9th Cir. 1994).[7]  To be

4    considered within the jurisdictional scope of the original charge, the claim must fall within the scope of a

5    "reasonably thorough investigation" by the agency, even if no such investigation took place.  Gibbs v. Pierce

6    County Law Enforcement Support, 785 F.2d 1396, 1400 (9th Cir. 1986).  "When an employee seeks

7    judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless

8    may encompass any discrimination like or reasonably related to the EEOC charge."  Oubichon v. North

9    American Rockwell Co., 482 F.2d 569, 571 (9th Cir. 1973).

10    From the period of April 29, 1999 to December 7, 2001, plaintiff brought each discrete incident of

11    alleged discrimination and harassment to the attention of the EEO.  There is little question—and indeed

12    defendant does not contest the point— that her series of EEO filings covered all race and sex discrimination

13    concerns during this period, as all incidents alleged in plaintiff's complaint would fall within the scope of a

14    reasonably thorough administrative investigation of her race and sex discrimination claims.  Farmer Bros.,

15    31 F.3d at 899.

16    The incidents contested by defendant for purposes of exhaustion are incidents prior to March 15,

17    1999, the latest possible date of the forty-five day EEO filing period.[8]  The continuing violations doctrine

18    allows courts to consider conduct that would ordinarily be time-barred as long as the untimely incidents

19    cumulatively represent an ongoing unlawful employment practice.  Nat'l R.R. Passenger Corp. v. Morgan,

20    536 U.S. 101, 116 (2002).  In the case of hostile work environment claims, the entire pattern of conduct

21    cumulatively creating the abuse working environment can be considered, as long as one act falls within the

22    filing period.  Id. at 117.  Discrete acts such as termination, failure to promote, denial of transfer, or refusal

23    to hire cannot be reached under this doctrine, as each one is an independently actionable event triggering

24    employer liability.  Id. at 114. Since these acts cannot be treated under this doctrine, this court cannot find

25    any basis of coverage for plaintiff's discrimination-related claims during this period.  Morgan, 536 U.S. at

26    114.  Plaintiff did file a request for counseling alleging a hostile work environment on February 7, 2001,

27    theoretically enabling plaintiff to reach a pattern of prior events cumulatively creating the abusive

28    atmosphere.  Id. at 116-17.  However, as discussed infra, plaintiff's allegations are not cognizable as

11

1  hostile work environment claims, and therefore cannot be bootstrapped as timely through this cause of

2  action.

3      Although the alleged incidents of disparate treatment during the period of 1993 to March 15, 1999

4  are not actionable, they can serve as "relevant background evidence" to put timely claims in context.

5  Morgan, 536 U.S. at 112.  Evidence, either direct or circumstantial, will be deemed relevant background

6  evidence where it tends to show intentional discrimination and combines with evidence of the employer's

7  present conduct to give rise to an inference of discrimination or disprove an employer's legitimate non-

8  discriminatory reason.  See Lyons v. England, 307 F.3d 1092, 1110-11 (9th Cir. 2002).  In the present

9  action, evidence of the assignment of details, the posting of promotional opportunities, the allocation of

10 performance-linked bonuses, and the management of staff all serve to place the specific incidents during

11 1999 and 2000 in a greater context, helping the factfinder to understand incidents in that period as plaintiff

12 herself, or a reasonable person in her situation, might have understood them.  See id., 307 F.3d at 1108-09

13 (holding that incidents tending to show intent prior to the statutory period, including denials of access to

14 favorable details and promotions, may be considered in assessing defendant's liability for similar actions

15 within the statutory period).  Other employees' experiences of discrimination are also admissible under the

16 post-Morgan standard, as such evidence is probative of defendant's intent.  Id. at 1110, n.12.

17     The court therefore finds that plaintiff has exhausted her administrative remedies to sue on incidents

18 alleged after March 15, 1999.  Incidents prior to that date are admitted where relevant as described above.

19

20 III.    Title VII Discrimination Claims

21     Plaintiff's first cause of action alleges unlawful discrimination and the creation of a hostile work

22 environment on the basis of race, national origin, and/or sex in violation of Title VII of the Civil Rights Act

23 of 1964.  See 42 U.S.C §§ 2000e, et seq.  Title VII of the Civil Rights Act of 1964 makes it unlawful "to

24 discharge any individual, or otherwise to discriminate against any individual with respect to his

25 compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42

26 U.S.C. § 2000e(k).  An employer violates Title VII if a protected characteristic is "a motivating factor for

27 any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-

28 2(m).  Despite great confusion on this issue prior to 2002, the Supreme Court has made it clear that a

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   plaintiff's burden in a Title VII disparate treatment case is no different than the "conventional rule of civil

2   litigation." Desert Palace v. Costa, 539 U.S. 90, 99 (2003).  That is, "the plaintiff in any Title VII case may

3   establish a violation through a preponderance of evidence (whether direct or circumstantial) that a

4   protected characteristic played a motivating factor [in the employer's challenged actions]." See Costa, 299

5   F.3d 838, 853-54 (9th Cir. 2002) aff'd 539 U.S. 90 (2003).[9]

6           A.      Disparate Treatment

7           In cases alleging disparate treatment on basis of gender, Title VII requires a plaintiff to prove that

8   the employer acted with a conscious intent to discriminate.  See Costa, 299 F.3d at 854.  To prove intent

9   to discriminate, plaintiff can pursue one of two analytical approaches: she can provide direct or

10  circumstantial evidence of intent or she can invoke the now well-settled prima facie case and burden-

11  shifting paradigm from McDonnell Douglas to establish circumstances sufficient to support an inference of

12  discrimination.[10]  See Costa, 299 F.3d at 855; McDonnell Douglas, 411 U.S. at 802-04.

13          The McDonnell Douglas inquiry involves three analytical stages.  First, a plaintiff must establish a

14  prima facie case of discrimination.  Costa, 299 F.3d at 855.  Second, the burden of production shifts,

15  requiring defendants to proffer a legitimate, non-discriminatory reason for the challenged action.  Id.  If

16  defendant succeeds at carrying his burden of production, the plaintiff then has "the full and fair opportunity

17  to demonstrate," through presentation of her case and through cross-examination of the defendant's

18  witnesses, that discrimination, rather than the proffered reason, was the true reason for the employment

19  decision.  See St. Mary's Honor Ctr. v. Hicks,

20  509 U.S. 502, 511 (1993).  Throughout these stages, a plaintiff retains the burden of persuasion to prove

21  unlawful discrimination.  Costa, 299 F.3d at 855.  As a general matter, the plaintiff in an employment

22  discrimination action need produce very little evidence in order to overcome an employer's motion for

23  summary judgment. This is because "the ultimate question is one that can only be resolved through a

24  searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." Chuang v.

25  University of California Davis, Bd. of Trustees, 225 F.3d 1115, 1124 (9th Cir. 2000) (internal citations

26  omitted).

27          1.      Failure to Promote and Assign to Details

28

13

Plaintiff's theory of disparate treatment largely turns on allegations that she was overlooked for promotions and desirable details. The Ninth Circuit has held, in a case very similar to the present action, that a pattern of denying advantageous temporary assignments to employees on the basis of race can constitute actionable discrimination under a "failure to promote" theory. Lyons, 307 F.3d at 1111-12. To establish a prima facie case of failure to promote due to racial discrimination, plaintiff must show 1) she is a member of a protected class; 2) she applied for and was qualified for open jobs; 3) she was rejected for these positions; and 4) an employee with qualifications similar to her own was treated more favorably. McGinest v. GTE Service Corp., 360 F.3d 1103, 1122, n.17 (9th Cir. 2004). The requisite degree of proof necessary to establish a prima facie case for Title VII claims on summary judgment "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot, 26 F.3d 885, 889 (9th Cir. 1994). The plaintiff need only offer evidence which gives rise to the necessary inference of discrimination. Costa, 299 F.3d at 855.

As a Filipino female, plaintiff clearly falls into a protected class covered by the plain language of Title VII and FEHA. Siam has also provided clear evidence of adverse employment actions, the third prong of the prima facie test. In 1999, she was denied two details to higher positions, and in May of 2000, she was denied the opportunity to compete for a promotion to EEO Center Manager. Plaintiff has raised genuine issues of material fact as to whether exclusion from eligibility for promotion and short-term details were indeed promotions. See Lyons, 307 F.3d at 1113 (holding that denial of temporary details could be deemed adverse employment actions by a reasonable factfinder); Strother v. S. California Permanente Med. Group, 79 F.3d 859, 868 (9th Cir. 1996) (finding adverse employment actions where an employee was excluded from meetings, seminars and positions that would have made her eligible for salary increases). In addition, plaintiff has provided evidence that in 2000, she was excluded from participation in a variable pay bonus program and entitlement to overtime backpay. As the effect of these incidents was to deny Siam compensation, they constituted changes to the terms and conditions of employment, and thus fall under the broad definition of adverse employment actions articulated by the Ninth Circuit. See Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2004).

Normally in failure to promote cases, a plaintiff must also show that she was qualified and applied for open positions. McGinest, 360 F.3d at 1122, n.17. However, it is well-settled that where openings

14

**United States District Court**
For the Northern District of California

1    are not published, or where they are awarded without a competitive application process, "it would be

2    unreasonable to require plaintiff to present direct evidence of the actual job qualifications as part of his

3    prima facie case" or show that he "applied" for the job through a formal procedure.  See Lyon, 307 F.3d at

4    1114.  Instead, a plaintiff must merely provide circumstantial evidence of her qualification for the position,

5    which may include her own self-assessment of performance.  Id. at 1115.  See also Jones v. Firestone Tire

6    & Rubber Co., 977 F.2d 527, 533 (11th Cir. 1992) (holding that an employee need not establish that he

7    applied for an available position where it is not published and where applications are not accepted for it).

8         In the present action, plaintiff has met her burden to establish that she was qualified for open details

9    and promotions.  Defendant does not contest, and the evidence bears out, that plaintiff was qualified for

10   promotion.  She served the USPS for 28 years, including more than eight years in a EAS-19 grade

11   position.  Before 1993 she was promoted several times, and after this point, she received performance

12   reviews of "outstanding," earned certificates of achievement, and was formally recommended for so-called

13   "far exceed" appraisals of her work.  Several of her peers testified of the quality of her work and the lack

14   of any concerns about performance.  The record does not contain a scintilla of evidence that her work was

15   less than satisfactory or that she was otherwise failing to meet expectations, and Siam testified that she

16   worked longer hours than Norris, cleared her backlogs and those of others more diligently, helped to

17   modernize the office's computerization, and had greater management experience.  See Dryovage Dec.,

18   Exh. A, Siam Aff. at 001084.  See also Norris Dep. at 42:22-43:7 (testifying that he had never seen Siam

19   fail to fulfill her duties and he was unaware of anything that would bar her from a promotion to an EAS-21

20   position).  Furthermore, detail assignments within the EEO were not published, and there was no

21   application procedure for obtaining the positions.  Therefore, plaintiff needn't show that she applied.  See

22   Lyon, 307 F.3d at 1114 (holding, in a factually indistinguishable context, that a plaintiff need not show that

23   they applied for temporary assignments to higher grade posts which were allocated without an application

24   process).

25        The last requirement of plaintiff's prima facie case is that other employees were treated more

26   favorably.  Plaintiff argues that two white male employees in her office, William Norris and Brian

27   Hemenway, were given extended, higher level detail assignments, and that other non-Asian, male

28   employees including Carl Thomas and Clotilde Blake were also favored.  Siam Dep. at 69:22-25, 90:16-

19.  Siam contends that she received a detail in 1996-97, but it was limited to less than 30 days to "give others a chance" for the experience, thus denying Siam the higher pay given for details longer than 30 days. Siam Dep. at 101:3-11, 104:1-5, 104:21-105:1.  Yet, plaintiff argues that her replacement on that detail was a man who had enjoyed the same detail several times before.  Id. at 94:23-25.  Siam also provides evidence that in 1999-2000, Hemenway (ranked below plaintiff as an EAS-17 employee) was given two extended details, one of which plaintiff had been told she would receive.  Id. at 70:6-11; 135:6-13.  Norris, who had a nearly identical work history as an EEO counselor/investigator until 1993, was similarly given an extended detail to a higher position in 1993, as well as a 1997-98 detail which lasted for two years.[11] These details led to Norris's permanent promotion in August 2000.  Id. at 81:10-19; Norris Dep. at 17:8-14.

In addition, plaintiff provided evidence sufficient for a reasonable factfinder to infer that management "changed the rules" on the EAS-21 position in August 2000 in order to block her and other Filipino employees' eligibility and set Norris up for a non-competitive promotion.  Siam Dep. at 125:10-13. Contrary to her supervisor's comment that plaintiff could not claim discrimination based on the promotion of a Filipino employee to an extended detail in 2000, "proof that the employer filled the sought position with a person not of the plaintiff's protected class is neither a sufficient nor a necessary condition of proving a Title VII case."  See Lyons, 307 F.3d at 1116 (internal quotations omitted).  By showing that during the long course of her eligibility for details and promotions, Norris and Hemenway were allowed to take extended details denied to plaintiff purportedly as a matter of policy, and they were given the opportunity to prove themselves in supervisorial promotions that led to their ultimate promotion, plaintiff has carried her burden on this prong of her prima facie case as well.

Plaintiff has satisfied her prima facie burden to show disparate treatment in office details and assignments.  In her motion for summary judgment, plaintiff has sought judgment on this issue.  The court determines that partial summary judgment on this issue would not appropriate, though plaintiff has indeed satisfied her burden.  At the trial stage, the burden-shifting framework dissolves into a singular inquiry for the factfinding jury: whether plaintiff has shown, by a preponderance of the evidence, that defendant intentionally discriminated against plaintiff based on her sex and race/national origin.  Costa, 299 F.3d at 855-56.  For this court to announce its judgment on the prima facie case to a jury would thwart plaintiff's

16

holistic showing of discrimination, foreclosing important items of evidence and intruding upon the

factfinder's mission of weighing all of plaintiff's evidence and determining whether she has proven

discrimination by a preponderance of the evidence.

Under the Title VII burden-shifting framework, defendants must come forward with legitimate, non-

discriminatory reasons for their decisions to bypass plaintiff for these opportunities.  See Costa, 299 F.3d

at 855.  Defendant proffers the testimony of Bernadine Faison, one of plaintiff's supervisors during the

period, who attested that she had instructed on of her managers to give Siam a detail to the Appeals Center

in an EAS-21 position, but that Siam declined the detail.  Simmons Dec., Exh. 1, Faison Aff. at 001150.

Faison also testified that Siam could not be given an EAS-21 detail at the Northern California Center

because she did not get along with Judy Martinez, another EAS-19 working there, nor with some of the

counselor/investigators there.  Id.

Defendant has provided evidence that the decisions made during the restructuring of 2000, both of

which led to the hiring of Norris in the EAS-21 position, were made pursuant to a restructuring policy

called "RIF avoidance."  According to the testimony of Mary Robinson, an EEO manager at the time, this

policy limits the first round of competition for new positions to those employees whose positions had been

impacted or abolished by the restructuring.  Robinson Dep. at 26:6-23.  Robinson testified that EEO

positions in the Pacific Area were limited to competition among EEO employees from that Area pursuant to

this policy of RIF avoidance.  Id. at 26:1-2.  She also testified that the decision to implement this policy

"came from headquarters" and that she did not know of the decision or inform Norris of the decision prior

to the actual job posting.  Simmons Supp. Dec., Exh. 1, Robinson Aff. at 001598.  She also stated that

Norris, Siam, and all other EAS-19 employees were given the same option to chose between a lower level

job with two years protected salary or to move out of the Pacific Area and into a specific California district.

Id.  These policy decisions, along with Siam's alleged reluctance to accept details and promotions for

interpersonal reasons, satisfy defendant's burden to show a legitimate non-discriminatory reason for her

termination.

At the third stage in the burden-shifting analytical framework, the burden of production shifts back

to the plaintiff, requiring her to introduce evidence that the employer's proffered reason for the adverse

employment decisions was pretextual.  Costa, 299 F.3d at 855.  To survive summary judgment,

17

1   circumstantial evidence of pretext must be "specific and substantial." <u>Bergene v. Salt River Proj. Agr.</u>

2   <u>Improv. & Power Dist</u>., 272 F.3d 1136, 1142 (9th Cir. 2001).  The trier of fact may still consider "the

3   evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the

4   issue of whether the defendant's explanation is pretextual." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>,

5   530 U.S. 133, 143 (2000) (internal quotations omitted).

6          Plaintiff has provided a great deal of evidence to demonstrate that defendant's evidence is a pretext

7   for discrimination.  First of all, she has provided her own testimony, as well as that of Yee, Cruz-Crowder,

8   and Dumaguit, who attested that plaintiff never refused or expressed disinterest in being detailed. Dryovage

9   Dec., Exh. A, Dumaguit Dec. at 1 (describing that Faison informed him that Siam was being skipped over

10  for the EAS-21 position because Siam "will never manage the center"); Dryovage Dec., Exh. A, Cruz-

11  Crowder Dec. at 2.  Secondly, plaintiff provided the declarations of Cruz-Crowder, Nelson, and Yee, who

12  stated that Siam did not have any interpersonal conflict with employees that would have impaired her

13  suitability for promotion.  <u>See</u> Dryovage Dec., Exh. A, Cruz-Crowder Dec. at 3; Dryovage Dec., Exh. A,

14  Nelson Dec. at 2.  Thirdly, Norris's reference to plaintiff as a "dragon lady" during a time when he acted as

15  one of her supervisors would suggest intent, as a jury could reasonably find that the comment was hostile to

16  Asians.  <u>See</u> <u>Lyon</u>, 307 F.3d at 1110, n.12 (holding that a single racially-motivated remark outside of the

17  statutory period, while not actionable standing alone, can be offered as background evidence tending to

18  prove intent and pretext for discrimination).

19         Plaintiff has also shown that while her career stagnated, Norris and Hemenway steadily advanced

20  from 1993-1999, providing relevant background evidence that plaintiff was not on a level playing field at

21  the commencement of the statutory period.  <u>See</u> <u>Lyons</u>, 307 F.3d at 1111.[12]  Similarly, plaintiff's showing

22  that details were allocated on a non-competitive basis and that such details were held by white male

23  employees for extended periods of up to two years, thus denying other employees the opportunity to

24  benefit from them, also provides important background evidence for assessing liability during the statutory

25  period.  <u>See</u> <u>id</u>. at 1111-12 (holding that such evidence may be "offered for its probative value in assessing

26  whether the employer's justifications for its present conduct lack credibility").  EEO Manager Yee's

27  testimony that Faison had an active bias against Siam and other Asian employees further reinforces this

28  evidence.  Dryovage Dec., Exh. G, Yee Aff. at 5-6.

18

United States District Court

For the Northern District of California

1         Finally, Siam argues that underrepresentation of Filipinos and other Asians in supervisory positions

2 at the USPS is further evidence of pretext. Statistical evidence may be admitted to show that a particular

3 employment decision was motivated by a pattern of discrimination. See Warren v. City of Carlsbad, 58

4 F.3d 359, 443 (9th Cir. 1995). See also McDonnell Douglas, 411 U.S. at 805. See also McGinest v.

5 GTE Service Corp., 360 F.3d 1103, 1111, 1123-24 (9th Cir. 2004) (accepting statistical disparities in

6 ethnic representation as evidence of discrimination in the disparate treatment context). However, the court

7 may properly evaluate the evidence for flaws, fallacies, or deficiencies in the data, including statistics based

8 on an unqualified applicant pool, small or incomplete data sets, and inadequate statistical techniques. See

9 Cerrato v. San Francisco Comm'y College Dist., 26 F.3d 968, 976-77 (9th Cir. 1994). The nature of

10 plaintiff's statistical submissions—the overall representation of Filipinos and other Asians in the Bay Area

11 and California populations as a whole and the representation of Filipinos and other Asians in the USPS

12 workforce as a whole—do not tell a complete story, because plaintiff has submitted no evidence of the

13 representation of these groups in the USPS workforce in general and in supervisory positions in particular.[13]

14         Even without making an adequate statistical showing, plaintiff has provided "specific and

15 substantial" evidence to meet her burden of showing pretext, and she is entitled to go to a jury on the

16 question of liability for discriminatory failures to promote during the period spanning March of 1999 to

17 January of 2001. While her evidence is not overwhelming, construing the record in the light most favorable

18 to plaintiff raises the necessary inference of discrimination. The "elusive factual question of intentional

19 discrimination" makes summary judgment inappropriate where plaintiff has stated a prima facie case and

20 raised genuine issues as to pretext. See Yartzoff v. Thomas, 809 F.2d 1371,1377 (9th Cir.1987) (quoting

21 Texas Dept. of Comm'y Affairs v. Burdine, 450 U.S. 248, 255 n.8 (1981)). Plaintiff has created triable

22 issues as to whether defendant's denial of details in 1999 and 2000, and promotion in 2000, were animated

23 by discrimination.

24         2.     Denial of Variable Pay and Overtime Backpay as a Disparate Treatment Claim

25         Plaintiff also argues that she was discriminated against in her exclusion from the variable pay

26 program in 2001 and in the failure to include her as eligible for overtime backpay. Her prima facie case on

27 this claim differs slightly from the failure to promote context. Here, plaintiff must show that (1) she belongs

28 to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she

19

United States District Court

For the Northern District of California

1   suffered an adverse employment action, and (4) other employees with qualifications similar to her own were

2   treated more favorably.  Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et

3   seq.  Bergene v. Salt River Project Agr. Imp. and Power Dist., 272 F.3d 1136, 1140 (9th Cir. 2001).   As

4   discussed, she has satisfied the first and second showings, and the court is satisfied that denial of income

5   through a bonus program or through overtime entitlement is an adverse employment action, which has been

6   broadly defined by the Ninth Circuit to include proven delays or reductions in compensation.  Ray v.

7   Henderson, 217 F.3d 1234, 1240 (9th Cir. 2004).

8        However, plaintiff has not carried her burden to show that other employees were treated more

9   favorably in exclusions from participation in the variable pay program for fiscal year 2001.  Plaintiff had

10  taken stress leave in January, 2001, and she did not return to work that year.  The EEO investigation of

11  plaintiff's 2001 complaint to the EEO revealed that between nine and eleven other employees in addition to

12  plaintiff were excluded from participation in the variable pay program due to long absences during the prior

13  year.  See Siam Dec., Exh. C, Notice of Right to File Suit, at 001540.  See also Palisoc Aff. at 001457.

14  Managers interviewed pursuant to the investigation stated that USPS policy instructed them to exclude

15  employees who did not fully contribute to the performance of the organization and that as a general rule, an

16  employee was expected to have been at work at least two months during the fiscal year to be eligible for

17  the program.  Siam Dec., Exh. C, Notice of Right to File Suit at 001540; Simmons Dec., Exh. 5, Blair Aff.

18  at 001458.

19       Nor has plaintiff carried her burden to show that other employees were treated more favorably in

20  notification of eligibility to apply for overtime back pay in 2001.  Defendant submitted the affidavit of Laree

21  Martin,[14] who described that in August of 2001, a backpay entitlement notice went to those employees that

22  held EAS-17 positions during the period of May 1, 1999 through approximately August 7, 2001.

23  Simmons Dec., Exh. 6, Martin Aff. at 001442-44.  Siam was not identified by a computer generated list of

24  employees who held such a position during the relevant time frame.  Id.  Norris's name did appear on this

25  list, however, and the evidence bears out that Norris was temporarily downgraded to EAS-17 during

26  2000.  Id; Norris Dep. at 17:6-7.  Norris did, however, end up receiving between six to seven thousand

27  dollars in overtime backpay for his work at level EAS-17 between 1987-1993, much earlier than the

28  eligibility time frame described by Laree Martin.  Norris Dep. at 37:8-25.

**United States District Court**
For the Northern District of California

1    If plaintiff is claiming that in 2001, based on discrimination, she was denied notice of her entitlement

2    to overtime backpay for the pre-1993 period that she and Norris had both served as EAS-17

3    investigators, Norris's receipt of backpay for his pre-1993 service would have been relevant to plaintiff's

4    claims.  Mysteriously, however, plaintiff has only alleged that she was denied backpay for hours worked

5    after February 1993, when she was promoted to level EAS-19.  <u>See</u> Comp. ¶ 76.  She is not, therefore,

6    claiming backpay for her service at level EAS-17.   As there is no evidence in the record that any employee

7    received overtime compensation for their work as an EAS-19 employee, plaintiff has not satisfied the prima

8    facie requirement that other employees were treated more favorably on the issue of entitlement to overtime

9    backpay.

10    Therefore, plaintiff has not raised triable issues of material fact on discriminatory exclusion from the

11    variable pay program or the overtime backpay program.  Defendant is entitled to summary judgment on

12    these components of plaintiff's disparate treatment claim.

13    <u>B.</u>    <u>Hostile Work Environment</u>

14    An employer is liable under Title VII for conduct giving rise to a hostile environment where the

15    employee proves that: (1) he or she was subjected to verbal or physical conduct of a harassing nature; (2)

16    this conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the

17    conditions of the victim's employment and create an abusive working environment.  Civil Rights Act of

18    1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; <u>Pavon v. Swift Trans. Co., Inc.</u> 192 F.3d 902, 908

19    (9th Cir. 2001); <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986).

20    To prevail on his hostile environment claim, a plaintiff is required to establish a "pattern of ongoing

21    and persistent harassment severe enough to alter the conditions of employment."  <u>Draper v. Coeur</u>

22    <u>Rochester, Inc.</u>, 147 F.3d 1104, 1108 (9th Cir. 1998) (citing <u>Meritor</u>, 477 U.S. at 66-67).   Whether an

23    environment is sufficiently hostile or abusive to violate Title VII, depends on "all the circumstances,

24    including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

25    humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

26    performance."  <u>Nichols v. Azteca Restaurant Enterprises, Inc.</u>, 256 F.3d 854, 872 (citing <u>Harris v. Forklift</u>

27    <u>Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).  More frequent conduct requires a lower level of severity, and vice

28    versa.  <u>Id</u>.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not

1   amount to discriminatory changes in the terms and conditions of employment." Id. (citing Faragher v. City

2   of Boca Raton, 524 U.S. 775, 787 (1998) (internal quotation marks omitted).  If plaintiff can show an

3   ongoing pattern of conduct creating an abusive working environment, her claims may include incidents prior

4   to the statutory period, as long as at least one event falls within the filing period.  Morgan, 536 U.S. at 117.

5        In the present action, the focus of plaintiff's hostile work environment allegations within the statutory

6   period relates to verbal remarks made to plaintiff, or about plaintiff to third persons.  These include

7   Hemenway's eruption at plaintiff during a staff meeting and Norris's angry and nearly violent confrontation

8   of plaintiff during a focus group session.  Siam Dep. at 161:22-162:3, 162:24-165:15, 173:1-2, 179:1-12.

9   Plaintiff testified that disciplinary action was not taken on either incident, and there is no evidence to the

10  contrary.  Id. at 173:12-15, 176:22-24.  In addition, she alleges that a hostile work environment was

11  created by the management condoning the posting of plaintiff's photograph on a "wanted" board for

12  criminal fugitives in approximately January of 2001.  Id. at 180:8-16.

13       Plaintiff also alleges a series of incidents for which she cannot remember any approximate date, but

14  which probably occurred prior to the statutory period.  These included: (1) Norris's comment to Faison

15  that he would prefer to "get rid of Siam" than her peer, which was overheard by Michael Yee, Dryovage

16  Dec., Exh. G, Yee Dec. at 3; (2) Norris's reference to plaintiff as a "dragon lady" in the presence of

17  another employee, Siam Dep. at 50:19-20; (3) Faison's comment to Dumaguit that "Lina Siam will never

18  manage this office," Dryovage Dec., Exh. A, Dumaguit Dec. at 1; (4) Norris's letter to Faison accusing

19  Siam of improper work on behalf of her counselor/investigators, Siam Dep. at 198:3-13; (5) Norris's

20  belittling comments with regards to plaintiff's project to computerize EEO forms, id. at 201:3-10; (6) a

21  comment made to another Filipino employee that if the Filipino employees speak Tagalog in the office, they

22  should do it in a locked room, id. at 201:12-14; and (7) an incident in which another senior specialist

23  coerced her subordinate to write a letter accusing Siam of harassment, id. at 211:1-7.  Other than these

24  incidents, plaintiff's evidence of a hostile work environment is focused primarily on disparate treatment,

25  rather than incidents of animus or hostility.

26       Plaintiff argues that taken together, the incidents of harassment and race- and sex-based

27  discrimination constituted a hostile work environment.  Plaintiff's evidence indeed tends to show that her

28  workplace was permeated with various forms of malicious conduct directed at plaintiff.  As Siam correctly

United States District Court

For the Northern District of California

argues, the circuits to have addressed the issue have held that a plaintiff need not prove that the hostile conduct she experienced was sexual or racist per se, however, she must prove that "but for her womanhood" (and/or race or national origin), the harassment would not have occurred.  See McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) *abrogated on other grounds by* Stevens v. Dep't of Treasury, 500 U.S. 1, 7 (1991); Burns v. City of McGreggor Elec. Indus., 989 F.2d 959, 964 (8th Cir. 1993); Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990); Bell v. Crakin Good Bakers, 777 F.3d 1497, 1503 (11th Cir. 1985); Lipsett v. Uni. of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988).  In the present action, plaintiff must demonstrate that racial or gender-based animus was at the heart of this conduct, and she must show that the incidents occurred with the level of frequency or severity required to make them actionable.  Draper, 147 F.3d at 1108.

Construing all the evidence in the light most favorable to the plaintiff—including accepting plaintiff's characterization that Norris's reference to plaintiff as a "dragon lady" was a racial epithet, that the "verbal attacks" by Norris and Hemenway were severe, and that posting plaintiff's photograph was done out of malice rather than as a matter of policy—plaintiff has nevertheless shown only a few isolated incidents that were not objectively serious or frequent enough to interfere with plaintiff's ability to do her job.  Faragher, 524 U.S. at 787.  Furthermore, other than the single "dragon lady" comment, and a comment made by plaintiff's peer to a third person concerning language discrimination against other employees, plaintiff has not demonstrated that hostility towards her stemmed from her identity as an Asian female.  See McKinney, 765 F.2d at 1138.

Defendant is entitled to summary judgment plaintiff's hostile work environment claim arising under Title VII.

C.     Retaliation

To establish a prima facie case of retaliation under Title VII, plaintiff must show (1) that she acted to protect her Title VII rights; (2) that an adverse employment action was thereafter taken against her; and (3) that a causal link existed between the two events.  Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a); McGinest v. GTE Service Corp., 360 F.3d 1103, 1124 (9th Cir. 2004).  In addition, "a plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was

1  aware that the plaintiff had engaged in protected activity."  See Raad v. Fairbanks N. Star Borough Sch.

2  Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).

3      Plaintiff clearly satisfies the first requirement of the prima facie showing.  Under the express terms of

4  the statute, engaging in a protected activity includes filing a charge of discrimination, testifying, or assisting in

5  any manner with an official investigation by the Equal Opportunity Commission or an equivalent state

6  agency.  See 42 U.S.C.A. § 2000e-3(a).  Plaintiff filed her first request for counseling at USPS on April

7  29, 1999, and subsequently submitted a series of requests and formal complaints in 2000, 2001, and 2002.

8

9      The second element of the prima facie case, requiring an adverse employment action, is also

10 satisfied.  As discussed, the Ninth Circuit has broadly defined such actions to be any incident "reasonably

11 likely to deter employees from engaging in protected activity."  Ray v. Henderson, 217 F.3d 1234, 1243

12 (9th Cir. 2000).  After April 29, 1999, plaintiff has raised four specific claims of adverse employment

13 actions: (1) alleged maneuvering to block plaintiff and other Filipino employees' eligibility for a promotion in

14 or around October, 2000, Siam Dep. at 125:10-13; (2) posting of plaintiff's picture in early 2001 as a

15 "wanted poster" at the facility where she had formerly worked, Siam Dep. at 180:8-16; (3) failure to notify

16 plaintiff of potential eligibility for overtime backpay in August of 2001, Dryovage Dec., Exh. A-14; and (4)

17 exclusion of plaintiff from the variable pay program in 2001. Siam Dep. at 206:3-8.  Any one of the actions

18 alleged would deter an employee from reporting discrimination, because they represent denied

19 advancement or income, as well as public mockery by an employer.  Plaintiff has satisfied this requirement.

20     A plaintiff must also show that the adverse employment action is causally linked to the protected

21 activity.  Such causality may be inferred by close proximity in time between the two events, although such

22 proximity must be "very close."  See Bell v. Clackamas County, 341 F.3d 858, 865-66 (9th Cir. 2003)

23 (holding that proximity in time may by itself constitute circumstantial evidence of retaliation).  See also

24 Porter v. California Dept. of Corrections, 383 F.3d 1018, 1030 (9th Cir. 2004) (holding that twenty

25 months is too attenuated a length of time to suggest causation, but that causation was established where

26 specific reasons explained this delay).  If a plaintiff cannot show proximity in time, he can prove causation

27 by providing direct evidence of retaliatory motivation.  Miller v. Fairchild, 797 F.2d 727, 731 (9th Cir.

28 1986).

United States District Court

For the Northern District of California

1    Approximately nineteen months lapsed between the time of plaintiff's April 1999 EEO filing and her

2    exclusion from eligibility for promotion in August of 2000.  Time, therefore, does not support an inference

3    of causation on this claim.  Plaintiff has failed to provide any circumstantial evidence of retaliatory

4    motivation for this incident.  While the handling of the restructuring in August 2000 did create triable issues

5    as to disparate treatment between Siam and Norris, and a pattern of advantageous treatment of white male

6    employees generally, there is no further evidence in the record tending to show that retaliation was a

7    motivating factor.

8    The three additional retaliatory incidents alleged by plaintiff all occurred in 2001, and each one

9    occurred one to four months after one of plaintiff's 2001 EEO filings, dated in February, April, and

10   December.  This timing is sufficient to satisfy the causation element.  See Yartzoff v. Thomas, 809 F.2d

11   1371, 1376 (9th Cir. 1987) (stating that sufficient evidence existed where adverse actions occurred less

12   than three months after complaint filed, two weeks after charge first investigated, and less than two months

13   after investigation ended).

14   Plaintiff has also made a marginal showing that Siam and others in her office were aware of

15   plaintiff's complaint to the EEO in 1999.  See Siam Dep. at 137:1-4.  This evidence is barely adequate for

16   a reasonable trier of fact to infer that supervisors in plaintiff's office were aware that plaintiff had engaged in

17   protected activity.  See Raad, 323 F.3d at 1197.  But taking the evidence in the light most favorable to

18   plaintiff, she has satisfied this element and made a prima facie showing on her latter three claims of

19   retaliation.

20   Defendant has, however, provided legitimate, non-discriminatory reasons for the actions alleged to

21   be retaliatory.  First of all, Bedell, whom Siam believes was responsible for posting Siam's picture as a

22   "wanted" sign in her building, testified that the picture was "posted in this normal manner" because Siam

23   had been out on stress leave for over 21 days, and that there was concern for her "safety and well-being if

24   she returned to the facility that she claimed was responsible for her stress."  Simmons Dec., Exh. 4, Bedell

25   Aff. at 0001673.  In addition, Bedell believed that Siam needed medical clearance before entering the

26   facility.  Id.  It is not for this court to determine whether Bedell's testimony amounted to a sarcastic

27   overstatement of the risks to Siam—and perhaps an expression of resentment that Siam was on medical

28   leave—or strict policy adherence based on a genuine concern for her safety.  In addition, as discussed

earlier in this order, defendant provided legitimate, non-discriminatory reasons (namely, USPS policies) for plaintiff's exclusion from the variable pay program and backpay for overtime.

In all three allegations of retaliation, plaintiff has failed to provide evidence raising a genuine issue that defendant's legitimate non-discriminatory reasons are pretextual. As to the "wanted" poster incident, plaintiff has shown, at worst, hostility and mockery directed at her based on her absence for stress-related medical leave. She has made no showing in either evidence nor arguments that her EEO filings triggered this mockery, nor any evidence that Bedell was aware of plaintiff's EEO filing. As for the overtime and backpay programs, plaintiff has not provided any evidence that her exclusion was based on anything more than general policy decisions affecting all employees equally. There is no insinuation of discrimination, nor anything that would link management's decisions on these matters to plaintiff's EEO filings or to the allegedly discriminatory staff in plaintiff's office. While exclusion from these opportunities constituted adverse employment actions, plaintiff has not raised triable issues of material fact as to whether her exclusion was motivated by her protected conduct.

Therefore, defendant is entitled to summary judgment on plaintiff's Title VII retaliation claims.

IV.     Plaintiff's Mitigation of Damages

Plaintiff argues that she is entitled to summary judgment on the issue of whether she mitigated her damages. Under California law, "[a] plaintiff has a duty to mitigate damages and cannot recover losses it could have avoided through reasonable efforts." Thrifty-Tel, Inc v. Bezenek, 54 Cal. Rptr. 2d 468, 474 (1996). See also Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1020 (9th Cir. 2000). Specifically, Title VII "requires the claimant to use reasonable diligence in finding other suitable employment." Odima v. Westin Tuscan Hotel, 53 F.3d 1484, 1497 (9th Cir. 1995). Employers carry the burden of proving that a plaintiff failed to mitigate his damages. Sanger v. United Air Lines, Inc., 633 F.2d 864, 868 (9th Cir. 1980).

Plaintiff has submitted evidence of her applications to at least fourteen other jobs in various agencies of the federal government, as well as for a lateral transfer within the USPS. See Siam Dec., Exh. D. Plaintiff's evidence of a job search commences in early 2003, approximately two years after she took stress leave from USPS. Id. Defendant argues that the current record provides an insufficient basis on which to

United States District Court

For the Northern District of California

1  determine when plaintiff should have begun to seek alternate employment.  Defendant also argues that

2  decision on this issue would be premature under Rule 56(f), because expert discovery has not yet

3  concluded on whether plaintiff could have begun seeking work earlier or how her damages should be

4  calculated.

5          Defendant has submitted no evidence to meet its burden of showing that during the time in question

6  there were substantially equivalent jobs available which plaintiff could have obtained and that plaintiff failed

7  to use reasonable diligence in seeking one of these positions.  See EEOC v. Farmer Bros. Co., 31 F.3d

8  891, 906 (9th Cir. 1994).  Nor has defendant formally moved for a continuance under 56(f) by submitting

9  "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some

10  basis for believing that the information sought actually exists."  Employers Teamsters Local Nos. 175 and

11  505 Pension, 353 F.3d 1125, 1129 (9th Cir. 2004).  Defendant has failed to show how the information

12  sought would preclude summary judgment, nor offered any reasons why satisfaction of its burden on these

13  issues could not be accomplished prior to the conclusion of discovery, nor any specific identification of

14  evidence that a continuation could achieve.   See id. at 1130.

15          Nevertheless, the court agrees with defendant that it would be premature to grant summary

16  judgment on the issue of mitigation of damages at this early stage.  The parties have not yet begun expert

17  discovery, and, as a matter of case management, it makes little sense to separate the issue of when and

18  whether plaintiff mitigated her damages from trial-phase questions concerning the amount of her damages as

19  a whole.  Such questions are properly reserved for trial.

20          Plaintiff's motion for summary judgment on the issue of mitigation of damages is therefore denied.

21

22  V.      Fair Labor Standards Act Claim

23          Plaintiff alleges that she did not qualify as an exempt employee under the FLSA and therefore was

24  entitled to overtime pay during the period from February 1993 through the present.  Compl. ¶ 54, 75-77.

25  Ordinarily, the FLSA requires employers to pay their employees time and one-half for work exceeding

26  forty hours per week.  29 U.S.C. § 207(a)(1).  Persons "employed in a bona fide executive, administrative,

27  or professional capacity," however, are exempt from overtime requirements.  29 U.S.C. § 213(a)(1).

28

1    Though it failed to argue the point in its papers on summary judgment, defendant raised the

2    affirmative defense of applicable statute of limitations in its answer.  Defendant has not, therefore, waived

3    the defense under Federal Rule of Civil Procedure 8(c).  See Tahoe-Sierra Preservation Council, Inc. v.

4    Tahoe Reg'l Planning Agency, 216 F.3d 764, 788 (9th Cir. 2000) ("[t]he inclusion of the defense in an

5    answer is sufficient to preserve the defense").  Claims under the FLSA are governed by a statute of

6    limitations of two years, or three years in cases of wilful violations by the defendant.  See 29 U.S.C. §

7    255(a).  Plaintiff's complaint, filed on January 9, 2004, was more than two years after plaintiff left her

8    employment with the USPS for medical leave in January of 2001.  Plaintiff has failed to argue or provide

9    evidence of a wilful violation that would bring her claim within the statute of limitations, even were she able

10   to argue that her claim accrued after January 9, 2001.

11        Defendant is entitled to summary judgment on plaintiff's FLSA claim.

12

13   CONCLUSION

14        For the foregoing reasons and as described herein, the court hereby GRANTS in part, denies in

15   part, plaintiff's motion for summary judgment as to exhaustion, prima facie liability under Title VII, and

16   mitigation of damages.  The court GRANTS defendant's motion for summary judgment as to liability under

17   Title VII for hostile work environment and retaliation claims only, as well as for liability under the Fair

18   Labor Standards Act.  The court DENIES defendant's motion for summary judgment as to liability under

19   Title VII for disparate treatment.

20

21        IT IS SO ORDERED.

22

23   Dated: 5/16/2005

24                                                    _/s/_____

25                                                    MARILYN HALL PATEL
                                                      United States District Court Judge
26                                                    Northern District of California

27

28

**ENDNOTES**

1. The parties in this action failed to submit a Joint Statement of Undisputed Facts, as required by this court's standing order and pursuant to Local Rule 56(2)(B).

2. EEO case number HO-0111-99.

3. EEO case number HO-0004-01.

4. EEO case number HO-0087-01.

5. EEO case number HO-0010-02.

6. Defendant states in its motion for summary judgment that "[m]ost of plaintiff's claims are based upon nothing more than hearsay upon hearsay," but never once names a specific item of objectionable evidence. "Unobjected to hearsay is admissible and of probative value in the district courts." N.L.R.B. v. Int'l Union of Operating Eng'rs, 413 F.2d 705, 707 (9th Cir. 1969). See also Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co., 864 F.2d 648, 651-52 & n. 2 (9th Cir.1988) (failure to object to allegedly defective evidence waives the objection for purposes of summary judgment). District courts cannot be expected to sift through the large body of evidence submitted to the court in order to apply a party's vague and generalized objections. Similarly, defendant's failure to object to any of the declarations or affidavits in evidence waives the objections the USPS could have made under Federal Rule of Civil Procedure 56(e). See Federal Deposit Ins. Corp. v. New Hampshire Ins. Co., 953 F.2d 478, 484 (9th Cir. 1991).

7. Scope of investigation standards developed in the context of EEOC complaints also apply to federal EEO filings. See generally Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1480 (9th Cir. 1997).

8. Defendant erroneously argued this period to be 30 days.

9. Plaintiff's bifurcation of direct evidence to prove discrimination and "indirect evidence" through the burden shifting framework is thus erroneous. Costa v. Desert Palace, decided now three years ago and subsequently affirmed by the Supreme Court, clarified the confusion in this doctrine. See 299 F.3d 838; 539 U.S. 90.

10. While it is clear under Costa, which was affirmed by a unanimous Supreme Court, that a plaintiff may choose to argue her case in terms of evidence of intentional discrimination or the burden shifting analysis, the Ninth Circuit recently held that disparate treatment claims "must proceed" along the McDonnell Douglas framework. Compare Bodett, 366 F.3d at 743 with Costa, 299 F.3d at 855. This distinction is merely a difference in the nomenclature of pre-trial analysis, as either way, plaintiff returns to her ultimate burden to prove by a preponderance of the evidence that her employer intentionally discriminated against her on the basis of her sex or race/national origin. Indeed, the burden-shifting framework is not appropriate for introduction to a jury. Costa, 299 F.3d at 855-56.

11. It does not matter that Norris's advantageous details predated the statutory period for plaintiff's claims. The statutory period does not apply to Norris, and there is no case law binding plaintiffs to "similarly-situated" colleagues who were treated more favorably simultaneous to plaintiff's ill treatment, so long as those employees had a similar disciplinary history and occupied the same job level. Furthermore, evidence of other employees' treatment prior to the statutory period speaks to the context of the events of 1999-2001. Practically speaking, without such evidence, no employee could demonstrate that they had faced a "glass ceiling" barrier on upward mobility.

12. This court notes its strong agreement with the court in Lyons that under Morgan and Evans, relevant, admissible background evidence from outside the period of actionable conduct may include indicators of a prior pattern of exclusion and barriers to advancement. See Lyons, 307 F.3d at 1111; Morgan, 536 U.S. at

112; <u>United Air Lines v. Evans</u>, 431 U.S. 553, 557-58 (1977). Without such an interpretation, <u>Morgan</u> would serve as a barrier to liability in most (if not all) failure to promote cases. Realistically, such cases involve the slow emergence of awareness by a plaintiff that their advancement has been blocked for reasons other than her qualifications or the poor judgment of decision-makers. Few plaintiffs would jump to an immediate conclusion of discrimination after a first incident of exclusion from promotions or other advancement opportunities. A prior pattern of thwarted advancement is relevant and probative evidence that timely actions were motived by reasons other than qualification or happenstance.

13. Plaintiff off-handedly commented in her opposition brief that defendant has denied this information to her. However, she has never raised this discovery dispute before this court.

14. Defendant erroneously identified this document as the affidavit of Cynthia Lefter. The affidavit was written pursuant to an investigation by Lefter, but Laree Martin was the affiant.